IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division



UNITED STATES OF AMERICA

v.

KIRSTEN VAN STEENBERG BALL,

*Defendant*.

**FILED UNDER SEAL**

Case No. 1:23-CR-80

Count 1: 21 U.S.C. § 846
Conspiracy to Distribute Oxycodone

Counts 2–21: 21 U.S.C. § 841(a)(1)
Distribution of Oxycodone

Forfeiture Notice:
21 U.S.C. § 853

## INDICTMENT

April 2023 TERM – Alexandria, Virginia

GENERAL ALLEGATIONS

1.    The Controlled Substances Act of 1970, codified at Title 21, United States Code, Sections 801 *et seq*., places controlled substances into five different categories, or "schedules," according to the drugs' potential for abuse, dependence, and current accepted medical use.

2.    Schedule II controlled substances are defined as drugs that have a high potential for abuse; that have a currently accepted medical use in treatment in the United States or a currently accepted medical use with severe restrictions; and that the abuse of which may lead to severe psychological or physical dependence.    Many Schedule II controlled substances have substantial cash value and can be resold on the street.    Generally, Schedule II controlled substances may only legally be dispensed by a written prescription issued by a licensed practitioner.

3.      For a prescription for a controlled substance to be effective, it "must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice." 21 C.F.R. § 1306.04(a).  Section 841(a)(1) of Title 21 of the United States Code is violated when a physician knowingly uses his or her authority to prescribe a controlled substance not for the treatment of a patient, but some other improper or non-medical purpose, including but not limited to aiding the maintenance of a drug habit.

4.      Oxycodone is a Schedule II controlled substance.  Oxycodone is a highly addictive opioid that, when prescribed legally, is used to treat severe pain conditions, such as post-operative pain, severe back and orthopedic injuries, and pain associated with certain forms of cancer and other terminal illnesses.

5.      Benzodiazepines are a class of depressant drugs used to treat conditions such as anxiety disorders, insomnia, and seizures.  Examples of benzodiazepines include alprazolam (brand name Xanax) and diazepam (brand name Valium).  In and around 2016, the Centers for Disease Control and Prevention (CDC) and the Food and Drug Administration (FDA) issued warnings, which were widely distributed to medical providers, cautioning against prescribing opioids and benzodiazepines together.  That is because combining benzodiazepines with an opioid increases the risk of serious respiratory depression, coma, and fatal overdose.

6.      Methadone is an opioid agonist primarily used to treat opioid use disorder.  It may, in limited cases, be used to treat severe pain.  It also presents a serious risk of respiratory depression and fatal overdose.

7.      A Drug Enforcement Administration ("DEA") registration number is an identifier assigned to a health care provider, such as a physician, by the DEA allowing that individual to write prescriptions for controlled substances.  Generally, a prescription for a controlled substance

2

may only be issued by a practitioner who has a DEA registration number and is authorized to prescribe controlled substances by the state in which the practitioner is licensed to practice.

8.     Under Virginia law, all prescriptions must be issued for a medicinal or therapeutic purpose and may only be issued to persons with whom the practitioner has a bona fide practitioner-patient relationship.     Va. Code Ann. § 54.1-3303(B).     A bona fide practitioner-patient relationship requires the practitioner to, among other things, (i) ensure that a medical or drug history was obtained; (ii) provide information to the patient about the benefits and risks of the drug being prescribed; (iii) perform or have performed an appropriate examination of the patient, either physically or by use of instrumentation and diagnostic equipment; and (iv) initiate additional interventions and follow-up care, if necessary, especially if a prescribed drug may have serious side effects.

9.     During all times relevant to this Indictment, the defendant KIRSTEN VAN STEENBERG BALL (hereinafter, "DR. BALL") was a doctor of medicine and the owner of a medical practice that she operated out of her residence in Arlington, Virginia, within the Eastern District of Virginia.   During all relevant times, by virtue of DEA and Virginia licensure, DR. BALL was authorized to prescribe, administer, and dispense controlled substances listed in Schedules II, III, IV, and V in the Commonwealth of Virginia.

### DR. BALL's Medical License

10.     DR. BALL was issued medical license number 0101-239199 by the Commonwealth of Virginia, Department of Health Professions, Board of Medicine (the "Board of Medicine") on or about November 30, 2005.

11.     In and around summer 2015, DR. BALL entered into a Consent Order with the Board of Medicine ("2015 Consent Order"), pursuant to which DR. BALL received a reprimand

3

for violating the Virginia Code and the Board of Medicine's regulations in her treatment of patients for chronic pain management by, among other things:

   a.  Failing to perform adequate physical examinations;

   b.  Failing to request and/or obtain medical records from prior treatment providers to establish patients' history of chronic pain;

   c.  Failing to recognize and take appropriate action in response to drug-seeking behavior in patients, such as receiving narcotics from multiple providers, seeking replacement prescriptions based on unsubstantiated claims or lost or stolen medication, or requesting early refills prior to the time prescriptions should have run out if taken as directed;

   d.  Failing to consistently, if ever, require patients to submit to urine drug screens to determine if patients were using illicit drugs and/or taking their medication as prescribed;

   e.  Failing to take responsive actions when patients tested positive for illicit substances or negative for their prescribed medications; and

   f.  Excessively prescribing narcotic medication to patients over short periods of time.

   12.    The Board of Medicine's investigation included a review of the medical records of eight of DR. BALL's patients.

   13.    In the 2015 Consent Order, DR. BALL agreed to complete 20 hours of continuing medical education ("CME") in the subject of the proper prescribing of controlled substances.   The Board of Medicine received a letter indicating that in and around February 2016, DR. BALL completed a three-day CME course covering topics such as "common problematic behaviors including inappropriately dispensing controlled substances from office practices, prescribing

4

overly large doses or quantities of drugs to individual patients, prescribing at too-frequent intervals," and "misprescribing," *i.e.*, "writing scripts for family members, friends, or known drug addicts (before other forms of therapy have been tried)."

14.     After completing the requirements of the 2015 Consent Order, DR. BALL continued to see patients and prescribe controlled substances for chronic pain management.

15.     As detailed below, the Virginia Department of Health Professions investigated DR. BALL again in and around 2021, related to her treatment of patient M.Y.   The Board of Medicine did not take any disciplinary action against DR. BALL; however, in May 2022, the Board of Medicine issued an advisory letter to DR. BALL suggesting that she "review and comply with the Regulations Governing Prescribing Opioids . . . regarding treatment of chronic pain."

16.     From a date unknown, but by at least 2012 through April 2022, DR. BALL had a DEA registration number of BB9684665, which allowed her to prescribe controlled substances. In and around April 2022, DR. BALL surrendered her DEA registration to law enforcement.

### DR. BALL's Medical Practice

17.     Over the course of approximately ten years, from at least in and around 2012 to April 2022, the defendant prescribed large quantities of oxycodone to her patients.   At times, the defendant prescribed to certain patients as many as 360 oxycodone 30-mg pills per month, an amount that is far greater than ordinary therapeutic doses.

18.     At all times relevant to this Indictment, DR. BALL nominally employed Candie Marie CALIX as her medical office manager.   CALIX did not, however, function as a typical office manager.   Instead, CALIX recruited individuals—including CALIX's mother, Kendall SOVEREIGN, and several other members of CALIX's family—to become "patients" of BALL.

19.     BALL, in turn, prescribed those "patients" significant quantities of oxycodone, far more than a person could ordinarily tolerate safely, let alone that they would genuinely need. Indeed, over the course of the conspiracy, BALL prescribed CALIX (who was ostensibly BALL's employee) approximately 50,000 oxycodone 30-mg or 15-mg tablets, an average of more than 400 oxycodone pills per month.

## COUNT ONE

### *(Conspiracy to Distribute Oxycodone)*

THE GRAND JURY CHARGES THAT:

20.     The introductory paragraphs above are re-alleged and re-incorporated as if fully set forth herein.

21.     Beginning in and around 2012 and continuing thereafter up to and including April 2022, the exact dates being unknown to the grand jury, in Arlington, Virginia, within the Eastern District of Virginia, and elsewhere, the defendant, KIRSTEN VAN STEENBERG BALL, did unlawfully, knowingly, and intentionally combine, conspire, confederate, and agree with Candie Marie CALIX and others, both known and unknown, to knowingly, intentionally, and unlawfully distribute and possess with intent to distribute oxycodone, a Schedule II controlled substance, in violation of Title 21, United States Code, Section 841(a)(1).

## OBJECT OF THE CONSPIRACY

22.     The object of the conspiracy was to maintain the medical practice of DR. BALL, who possessed a license to prescribe controlled substances, so that DR. BALL could prescribe large quantities of oxycodone to CALIX and other patients of DR. BALL, including CALIX's family members.  Such prescriptions were issued without regard to whether the patients had any actual medical need for the oxycodone and without regard to whether the patients ingested the prescribed oxycodone as directed.

23.     The object of the conspiracy was further to avoid scrutiny of DR. BALL's prescription practices by regulatory authorities, such as the Board of Medicine, and by law enforcement.

<u>WAYS, MANNER, AND MEANS</u>

The ways, manner, and means by which DR. BALL, CALIX, and others sought to accomplish the conspiracy included, but were not limited to, the following:

24.     DR. BALL and CALIX operated DR. BALL's medical practice out of DR. BALL's residence in Arlington, Virginia.   The medical practice purported to be a legitimate medical practice for internal medicine and the management of chronic pain.

25.     DR. BALL saw patients who sought to obtain Schedule II narcotic controlled substances, primarily oxycodone.   Although DR. BALL's medical practice was in Arlington, many of her patients traveled long distances for their appointments, including from northwestern Virginia (including Front Royal and Winchester) or even as far away as southwestern West Virginia.

26.     CALIX used the alias "Nicole Thomas" while working as DR. BALL's office manager.   This concealed the fact that CALIX was also a patient of DR. BALL.   DR. BALL and CALIX had a close, familial relationship; for example, CALIX referred to DR. BALL as "mamacita," and DR. BALL referred to herself as "Grams" with respect to one of CALIX's daughters.

27.     CALIX performed some administrative tasks for DR. BALL, including scheduling and some insurance billing, as well as work other than what an office manager would perform, such as housekeeping and cleaning.

28.     CALIX recruited individuals, including CALIX's close family members, to become patients of DR. BALL.  This was because DR. BALL, through the use of her DEA registration number and medical license, prescribed large quantities of oxycodone to her patients without a legitimate medical purpose.

29.     In exchange for getting them in to be patients of DR. BALL, the individuals that CALIX recruited as patients gave CALIX a portion of their oxycodone pills to sell for profit.

30.     Many of the individuals that CALIX recruited resided in Front Royal, Virginia, which is approximately one hour's drive from DR. BALL's residence.  For some period of time during the existence of the conspiracy, DR. BALL traveled approximately once a month to Front Royal to see patients at CALIX's family home.

31.     DR. BALL routinely failed to conduct appropriate physical examinations of patients and review and independently assess patients' progress with a treatment plan.  Further, DR. BALL routinely failed to refer patients out for diagnostic tests, such as X-rays or MRIs, to assess reported injuries.

32.     DR. BALL authorized renewals of medication without examining the patients and/or without medical indication other than what uncorroborated information the patients themselves provided.

33.     DR. BALL sometimes permitted CALIX to direct and guide selection of the oxycodone quantities that CALIX and the patients that CALIX recruited were prescribed.  At times, CALIX warned DR. BALL that certain patients were not taking their pills as directed, and that such patients could cause trouble for DR. BALL and the ongoing viability of her medical practice.

34.     Although CALIX was purportedly DR. BALL's employee and patient, CALIX and her family paid for DR. BALL's medical malpractice insurance.

35.     DR. BALL issued prescriptions for oxycodone to some of her patients without seeing them for an in-person visit.   DR. BALL sometimes issued prescriptions for oxycodone to some patients in advance of their in-person or telephonic appointments.

36.     DR. BALL continued prescribing oxycodone to patients who were known or believed to be selling their pills.

37.     DR. BALL concurrently prescribed large quantities of oxycodone and benzodiazepines to some patients, contrary to CDC and FDA warnings.

38.     DR. BALL fabricated and falsified patient medical records, such as by omitting material information that might be indicative of addiction, abuse, or sale of controlled substances.

39.     DR. BALL collected payments, often in cash, in exchange for visits during which the patient received prescriptions for oxycodone without any physical or other examination or medical justification for those prescriptions.

40.     For some period of time relevant to this Indictment, DR. BALL directed her patients to fill their prescriptions at an independent pharmacy in Falls Church, Virginia ("Pharmacy-1"), which is in the Eastern District of Virginia.   That is because some retail pharmacies in the area refused to fill prescriptions that DR. BALL issued.   The owner of Pharmacy-1 also received prescriptions from DR. BALL.

41.     At times, DR. BALL recommended reducing the amount of oxycodone that she prescribed to her patients by a negligible amount.   This was not done for the patient's health, but rather, so that she could avoid scrutiny by regulatory authorities and law enforcement.

## OVERT ACTS

In furtherance of the conspiracy, and to effect the objects thereof, the following overt acts, among others, were committed by DR. BALL, CALIX, and others in the Eastern District of Virginia and elsewhere:

### *Candie CALIX*

42.     CALIX became a patient of DR. BALL's in and around 2012.   Sometime thereafter, but no later than in or around 2013, CALIX began working for DR. BALL, nominally as her office manager.   Nevertheless, DR. BALL continued to prescribe oxycodone to CALIX every month through in and around April 2022.

43.     DR. BALL also prescribed CALIX diazepam concurrently with the oxycodone beginning in and around 2012.

44.     As referenced above, in and around June 2015, DR. BALL signed the 2015 Consent Order, which documented her violations of the Virginia Code and the Board of Medicine's regulations with respect to eight of her patients, one of which was CALIX.   DR. BALL did not disclose to the Board of Medicine that CALIX was her office manager.

45.     In and around 2015, DR. BALL noted multiple times in CALIX's patient files that CALIX was pregnant.   Nevertheless, DR. BALL continued to prescribe CALIX large quantities of oxycodone.   Indeed, on or about September 17, 2015, during CALIX's pregnancy, DR. BALL increased CALIX's monthly dosage of oxycodone.

46.     According to DR. BALL's patient files, CALIX was pregnant again in and around 2017; however, DR. BALL continued to prescribe CALIX large quantities of oxycodone during this time.   After CALIX delivered in and around September 2017, DR. BALL noted that she would "reduce [CALIX] back to pre-pregnancy dose" of oxycodone.

47.     As noted above, in 2016, the CDC and FDA disseminated warnings to medical providers about the risks of prescribing opioids and benzodiazepines together.   Nevertheless, DR. BALL continued to concurrently prescribe oxycodone and diazepam to CALIX.

48.     On or about May 27, 2019, DR. BALL issued the following five prescriptions to CALIX:

      a.  200 oxycodone 15-mg pills,

      b.  200 oxycodone 15-mg pills,

      c.  200 oxycodone 15-mg pills,

      d.  120 oxycodone 15-mg pills, and

      e.  30 diazepam 10-mg pills (with four refills).

These prescriptions were all filled at Pharmacy-1, in Falls Church, Virginia, within the Eastern District of Virginia.

49.     On or about November 6, 2020, DR. BALL received the result of a urine drug screen (UDS) that CALIX had received.   The UDS report, which was placed in CALIX's patient file, showed that the urine screen was "inconsistent" with CALIX's prescribed medication. Specifically, CALIX's urine tested positive for hydrocodone, a Schedule II opioid for which she did not have a valid prescription.   On or about November 8, 2020, however, DR. BALL issued two prescriptions to CALIX, each for 180 oxycodone 30-mg pills.   The following day, during CALIX's telemedicine appointment, DR. BALL documented in CALIX's patient file, "The UDS results were reviewed and are consistent."

### Kendall SOVEREIGN

50.     SOVEREIGN, who also used the name "Kendall Kilinski," is CALIX's biological mother.   In and around 2013, CALIX recruited SOVEREIGN to be a patient of DR. BALL.

Beginning no later than in and around August 2013, DR. BALL prescribed oxycodone to SOVEREIGN every month through in and around April 2022.

51.    Also beginning in and around August 2013, DR. BALL began prescribing diazepam pills to SOVEREIGN, concurrently with the oxycodone.   Despite the CDC's and FDA's warnings in and around 2016, DR. BALL continued to concurrently prescribe oxycodone and diazepam to SOVEREIGN.

52.    On or about April 2, 2018, DR. BALL noted in SOVEREIGN's medical file that SOVEREIGN was "aware of the risks of opioid and benzos [benzodiazepines] together and she has naloxone."   Naloxone, known commonly by the brand name Narcan, is a medication used in emergencies to rapidly reverse opioid overdose.

53.    On or about August 20, 2018, DR. BALL issued the following four prescriptions to SOVEREIGN:

      a.   180 oxycodone 30-mg pills,

      b.   180 oxycodone 15-mg pills,

      c.   90 methadone 10-mg pills, and

      d.   90 diazepam 10-mg pills.

These prescriptions were all filled at Pharmacy-1.

54.    In and around 2020, DR. BALL made an entry into SOVEREIGN's medical chart dated October 12, 2020, as if documenting a medical appointment with SOVEREIGN.   The entry, however, was based on a letter that SOVEREIGN wrote to DR. BALL, rather than on an actual appointment, either in-person or telephonic.   The letter was not received by DR. BALL until on or about December 6, 2020.   Nevertheless, on or about October 11, 2020, DR. BALL issued the following prescriptions to SOVEREIGN:

    a.   180 oxycodone 30-mg pills,

    b.   180 oxycodone 15-mg pills, and

    c.   60 methadone 10-mg pills.

These prescriptions were all filled at Pharmacy-1.

### *H.H.*

55.    H.H. is CALIX's husband. In and around 2012, CALIX recruited H.H. to be a patient of DR. BALL. Beginning no later than in and around November 2012, DR. BALL prescribed oxycodone to H.H. every month through in and around April 2022.

56.    Beginning in and around November 2013, DR. BALL began prescribing diazepam to H.H., concurrently with the oxycodone. Despite the CDC's and FDA's warnings in and around 2016, DR. BALL continued to concurrently prescribe oxycodone and diazepam to H.H.

57.    Although H.H. purportedly suffered from chronic pain, DR. BALL periodically paid H.H. to do manual labor at her home/medical practice.

58.    On or about March 25, 2019, DR. BALL issued two prescriptions to H.H., one for 200 oxycodone 30-mg pills, and another for 160 oxycodone 30-mg pills—a total of 360 oxycodone 30-mg pills for the month. DR. BALL did not conduct an in-person medical appointment with H.H. prior to issuing these prescriptions. Both prescriptions were filled at Pharmacy-1.

59.    On or about April 4, 2019, H.H. went to DR. BALL's residence in Arlington, within the Eastern District of Virginia. There, he carried a very large ladder from the back of the house to the front of the house. The ladder was large enough to reach from the ground to the roof of DR. BALL's two-story residence. Thereafter, without any apparent difficulty, H.H. climbed the ladder to perform maintenance on the gutters. DR. BALL paid H.H. $200 for performing this maintenance for her.

60.     On or about April 23, 2019, DR. BALL issued two prescriptions to H.H., one for 200 oxycodone 30-mg pills, and another for 160 oxycodone 30-mg pills—a total of 360 oxycodone 30-mg pills for the month.   DR. BALL did not conduct an in-person medical appointment with H.H. prior to issuing these prescriptions.   Both prescriptions were filled at Pharmacy-1.

### C.T.-1

61.     C.T.-1 is CALIX's grandfather.   In and around 2013, CALIX recruited C.T.-1 to be a patient of DR. BALL.   Beginning no later than in and around June 2013, DR. BALL prescribed oxycodone to C.T.-1 every month through in and around April 2022.

62.     On or about November 4, 2019, DR. BALL issued two prescriptions to C.T.-1, one for 200 oxycodone 30-mg pills, and another for 160 oxycodone 30-mg pills—a total of 360 oxycodone 30-mg pills for the month.   CALIX and SOVEREIGN filled both prescriptions at Pharmacy-1.

63.     On or about November 11, 2019, DR. BALL wrote an entry in C.T.-1's patient file documenting an appointment to justify the prescriptions she issued on November 4.   The note did not document any current pain symptoms that would be treated by opioids.

64.     On or about December 2, 2019, DR. BALL issued two prescriptions to C.T.-1, one for 200 oxycodone 30-mg pills, and another for 160 oxycodone 30-mg pills—a total of 360 oxycodone 30-mg pills for the month.   CALIX and SOVEREIGN filled both prescriptions at Pharmacy-1.

65.     On or about December 9, 2019, DR. BALL wrote an entry in C.T.-1's patient file documenting an appointment to justify the prescriptions she issued on December 2.   The note did not document any current pain symptoms that would be treated by opioids.

## T.H.

66.     In and around 2014, CALIX recruited T.H., another resident of Front Royal, to become a patient of DR. BALL.   Thereafter, DR. BALL prescribed T.H. oxycodone 30-mg pills every month through in and around July 2015.   DR. BALL also concurrently prescribed diazepam to T.H.

67.     On or about June 3, 2015, DR. BALL issued two prescriptions to T.H., each for 160 oxycodone 30-mg pills—a total of 320 pills.   The first prescription was filled on or about June 3, 2015.   The second prescription was filled on or about June 17, 2015.

68.     DR. BALL wrote a letter to T.H. dated June 24, 2015, discharging T.H. from her practice for violating her policies.   Nevertheless, DR. BALL continued to issue prescriptions to T.H. for oxycodone through the following month.

69.     On or about June 26, 2015, DR. BALL issued another prescription to T.H. for 180 oxycodone 30-mg pills—bringing T.H.'s total number of oxycodone 30-mg pills for the month of June 2015 to 500.   This prescription was filled on or about June 29, 2015.

70.     Thereafter, on or about July 14, 2015, DR. BALL issued another prescription to T.H. for 160 oxycodone 30-mg pills.   This prescription was filled on or about July 14, 2015.   This was the last prescription DR. BALL issued to T.H.

71.     In and around August 2015, T.H. died of a drug overdose.   Analysis of postmortem blood samples from T.H. revealed the presence of oxycodone, among other controlled substances.

## M.W.

72.     In and around 2013, M.W. became a patient of DR. BALL.   Beginning no later than in and around July 2013, DR. BALL prescribed oxycodone to M.W. every month through in and around January 2020.

15

73.    Throughout the course of M.W.'s tenure as a patient with DR. BALL, DR. BALL noted consistent "red flags" in M.W.'s patient file, indicative of drug misuse or abuse.   Such red flags included early requests for prescriptions, lost or stolen medication, taking medication more quickly than prescribed, trouble with law enforcement, and non-compliance with requests for urine drug screens.

74.    In and around January 2019, DR. BALL received a phone call from a local pharmacy, notifying DR. BALL that M.W. was under investigation by federal law enforcement for selling M.W.'s medication.   DR. BALL noted this phone call in M.W.'s medical file on or about January 17, 2019.

75.    Nevertheless, on or about January 23, 2019—less than a week later—DR. BALL issued a prescription to M.W. for 180 oxycodone 30-mg pills.

### *M.Y.*

76.    In and around 2013, M.Y. became a patient of DR. BALL.   Beginning no later than in and around June 2013, DR. BALL prescribed oxycodone to M.Y. every month through in and around January 2022.

77.    Although M.Y. was ostensibly DR. BALL's patient, on or about December 21, 2018, DR. BALL wrote a check for $40,000 to M.Y.

78.    DR. BALL consistently prescribed oxycodone to M.Y., despite multiple suspicious patterns of behavior indicative of drug misuse or abuse.   Such "red flags" included regular early refills, ostensibly due to travel; several instances of lost, damaged, discarded, or stolen medication; and routine use of multiple pharmacies.   DR. BALL documented these suspicious behaviors in M.Y.'s patient files.

79.     CALIX also placed notes to DR. BALL in M.Y.'s file.  On or about March 19, 2019, CALIX wrote a note to DR. BALL which stated, in part, "he keeps promising to follow the rules but he doesn't and this is not fair to all your other patients that do, this is putting you in danger and is not ok because this just keep happening. If he breaks this again no matter what the reason he needs to be terminated.  He has violated the written warning multiple times since signing... we need to terminate."  Nevertheless, DR. BALL continued to prescribe oxycodone to M.Y.

80.     On or about December 4, 2019, DR. BALL noted in M.Y.'s file, "I'm at risk of losing my license because of your frequent visits that had to be too early so you accumulated a thousand tabs [tablets of oxycodone] more than you should have had . . . and I don't have a shred of documentation for any of it, despite asking you repeatedly."

81.     Nevertheless, the following day, DR. BALL issued a prescription to M.Y. for 60 oxycodone 10-mg pills on or about December 5, 2019.

82.     Less than a month later, DR. BALL issued a prescription to M.Y. for 180 oxycodone 15-mg pills on or about January 2, 2020.  On or about the same day, DR. BALL noted in M.Y.'s patient file that she had spoken to a pharmacist at M.Y.'s pharmacy, and the pharmacist told DR. BALL that M.Y. was receiving too much oxycodone.

83.     By in and around the end of October 2020, DR. BALL issued a prescription to M.Y. for 220 oxycodone 15-mg pills approximately every eighteen days.  On or about November 16, 2020, DR. BALL noted in M.Y.'s patient file that M.Y. had informed her that he had been taking almost double the amount of oxycodone he had been taking before.

84.     Nevertheless, on or about November 12, 2020, DR. BALL issued a prescription to M.Y. for 220 oxycodone 15-mg pills.   Then, on or about November 30, 2020, DR. BALL issued another prescription to M.Y. for 220 oxycodone 15-mg pills.

85.     On or about October 20, 2021, the Virginia Department of Health Professions Enforcement Division ("DHP-ED") received an anonymous complaint, from an individual who claimed to be a pharmacist, alleging that DR. BALL prescribed excessive oxycodone to M.Y. DHP-ED initiated an investigation.

86.     During the investigation, DR. BALL submitted a written statement to DHP-ED dated December 2, 2021, in which she stated that she was "ending [M.Y.'s] long-term treatment with my practice altogether."   Nevertheless, on or about December 24, 2021, DR. BALL issued a prescription to M.Y. for 230 oxycodone 15-mg pills.

87.     On or about January 4, 2022, DR. BALL—through counsel—advised DHP-ED that by early December 2021, M.Y. was no longer a patient with DR. BALL's practice.   Nevertheless, on or about January 25, 2022, DR. BALL issued another prescription to M.Y. for 230 oxycodone 15-mg pills.

88.     On or about May 17, 2022, DHP-ED closed the investigation because the anonymous complaint was deemed "undetermined."   By that time, DR. BALL had surrendered her DEA prescriber number to federal law enforcement.

### C.T.-2

89.     In and around 2015, C.T.-2 became a patient of DR. BALL.   Like the other patients discussed herein, DR. BALL prescribed oxycodone to C.T.-2 every month through in and around March 2022.

90.     On or about December 8, 2020, before conducting an appointment, DR. BALL issued a prescription to C.T.-2 for 240 oxycodone 30-mg pills.   Thereafter, DR. BALL conducted a telephonic appointment with C.T.-2.   DR. BALL and C.T.-2 discussed C.T.-2's shoulder pain for approximately 30 seconds; the remainder of the approximately 35-minute call was not related to C.T.'s medical condition.

91.     On or about June 22, 2021, before conducting an appointment, DR. BALL issued a prescription to C.T.-2 for 240 oxycodone 30-mg pills.   Thereafter, DR. BALL conducted a telephonic appointment with C.T.-2.   DR. BALL informed C.T.-2 that C.T.-2 was overdue for providing a urine screen and stated that she would mail C.T.-2 paperwork to provide the urine screen at another medical facility.   This was contrary to typical medical practice, which is to request a random drug test that the patient does not know about in advance.

92.     On or about July 21, 2021, DR. BALL conducted a telephonic appointment with C.T.-2.   DR. BALL made no mention of a urine screen, which C.T.-2 had not submitted.   On or about the same day, DR. BALL issued a prescription to C.T.-2 for 240 oxycodone 30-mg pills, as well as two prescriptions for 90 diazepam 10-mg pills.

93.     On or about September 15, 2021, DR. BALL conducted a telephonic appointment with C.T.-2.   During the phone call, DR. BALL told C.T.-2 that DR. BALL was going to prescribe C.T.-2 naloxone nasal spray (Narcan) in addition to oxycodone because C.T.-2 was taking so much oxycodone, C.T.-2 was at risk of overdosing.   On or about the same day, DR. BALL issued a prescription to C.T.-2 for 240 oxycodone 30-mg pills, as well as for naloxone nasal spray (Narcan).

94.     C.T.-2 submitted a urine screen on or about October 15, 2021.   The urine screen was negative for oxycodone or any other controlled substances.   C.T.-2's next appointment with DR. BALL occurred on or about November 10, 2021, at which time C.T.-2 informed DR. BALL

that C.T.-2 had "taken more oxycodone than [she] should have and ran out" early.   During the appointment, DR. BALL informed C.T.-2 that C.T.-2's drug test had returned as negative for any controlled substances and told C.T.-2 that it "look[ed] bad."

95.     DR. BALL further stated that DR. BALL was under pressure "from the state" to only give patients the minimum amount of oxycodone they needed.   When C.T.-2 informed DR. BALL that C.T.-2 was considering moving to another state, DR. BALL stated, "There are a lot of reasons why doctors don't want to prescribe oxycodone at the amount that you are taking.   You take a lot.   And it has become quite obvious that, not only is it not good for patients to take that much, but it's also not good for doctors to prescribe that much, you know, you're really running a risk, a lot of risk. . . . I wouldn't want to count on you finding somebody [another doctor] that's gonna write eight a day of oxycodone 30-mg. . . . It's dangerous to write that much."

96.     Thereafter, DR. BALL issued two prescriptions to C.T.-2: one for 210 oxycodone 30-mg pills, and one for 30 oxycodone 15-mg pills.   DR. BALL did not decrease C.T.-2's oxycodone prescription any further.   DR. BALL continued to prescribe this quantity of oxycodone to C.T.-2 every month until DR. BALL surrendered her DEA license in April 2022.

*UC-1*

97.     In and around June 2021, an undercover law enforcement officer ("UC-1") was introduced to DR. BALL and became one of her patients.   Thereafter, through in and around March 2022, DR. BALL prescribed oxycodone 15-mg pills to UC-1 every month.

98.     At no point did DR. BALL discuss further diagnostic evaluation of UC-1's pain, such as referring UC-1 for an MRI or X-ray.   At no point did DR. BALL order any lab tests other than two urine drug screens.   At no point did DR. BALL discuss referring UC-1 to a specialist for

his reported increasing symptoms of back pain, despite the fact that UC-1 purported to be taking opioids.

99.     During UC-1's initial visit with DR. BALL, UC-1 told DR. BALL that he had previously taken oxycodone from a family member's prescription and wanted to get his own prescription.  DR. BALL stated to UC-1 that it was "politically incorrect to be doing [prescribing] oxycodone."  DR. BALL further stated that she was "getting crazy pressure from the state and the feds."

100.    On or about July 13, 2021, during a telephonic appointment, UC-1 told DR. BALL that he had consumed some of UC-1's father's pills.  In response, DR. BALL stated that that was "highly illegal" and that she was not writing down that statement in UC-1's chart.  DR. BALL asked whether UC-1 would use insurance to cover his oxycodone, and UC-1 responded that he would not.  DR. BALL stated in response, "that makes things easier because insurances never want you to take oxycodone for more than a couple of days."  DR. BALL then issued a prescription for 30 oxycodone 15-mg pills to UC-1.

101.    At UC-1's next telephonic appointment, on or about August 11, 2021, UC-1 told DR. BALL that he had run out of oxycodone early, and UC-1 asked for 35 pills instead of 30 for his next prescription.  In response, DR. BALL issued a prescription for 60 oxycodone 15-mg pills to UC-1.

102.    At UC-1's next telephonic appointment, on or about September 8, 2021, UC-1 told DR. BALL that he had injured himself and therefore needed to take more of his oxycodone.  DR. BALL did not refer UC-1 for an X-ray or other diagnostic evaluation and did not ask him to come in for a physical examination.  Instead, DR. BALL requested UC-1 provide her with a written statement to document the injury.  DR. BALL explained, "We are all under the eagle eye of Big

Brother" and "when they look at my chart, they need to see more than just you saying you hurt yourself." Thereafter, DR. BALL issued a prescription to UC-1 for 60 oxycodone 15-mg pills.

103.   On or about November 5, 2021, during a telephonic appointment, UC-1 told DR. BALL that he had run out of his oxycodone pills and had to consume some of UC-1's father's pills. DR. BALL informed UC-1 that doing so was a felony offense, but that she would not write that information down in UC-1's chart. DR. BALL then issued a prescription for 60 oxycodone 15-mg pills to UC-1.

104.   On or about December 3, 2021, during a telephonic appointment, UC-1 told DR. BALL that UC-1 had purchased some oxycodone from one of his friends and requested that DR. BALL increase his monthly dosage. DR. BALL agreed and issued a prescription for 72 oxycodone 15-mg pills to UC-1.

105.   On or about January 21, 2022, during a telephonic appointment, UC-1 told DR. BALL that UC-1 had had a few oxycodone pills left over from his previous prescription, so he gave some to family members. DR. BALL responded, "Don't tell me that . . . I'm not going to write it down." Then, DR. BALL issued a prescription for 72 oxycodone 15-mg pills to UC-1.

106.   In and around February 2022, DR. BALL directed UC-1 to provide a urine screen. UC-1's urine screen did not show the presence of any oxycodone, which indicated that he was not taking the oxycodone that he claimed he needed.

107.   On or about March 15, 2022, UC-1 told DR. BALL that he had run out of his pills again. UC-1 asked DR. BALL to increase his monthly dosage again. DR. BALL issued a prescription for 90 oxycodone 15-mg pills to UC-1, however, she asked that he provide her with an explanation by phone the following day.

108.    The next day, UC-1 informed DR. BALL that he ran out of pills early and had taken a few from another person.   UC-1 further informed DR. BALL that the 90 pills she had prescribed him the day before would allow him to repay the other person for the pills he had taken.   In the same phone call, DR. BALL informed UC-1 that his urine screens were both negative for the presence of oxycodone.   Regarding UC-1's negative urine screens, DR. BALL stated, "The [urine screen] that you did last July was also negative on the oxycodone, so this isn't looking very good. You know what the Board of Health thinks when they look but hopefully, they won't look at it."

### The Search Warrant

109.    On or about April 7, 2022, agents from the Federal Bureau of Investigation executed a search warrant at the residence of CALIX, SOVEREIGN, H.H., C.T.-1, and other family members in Front Royal, Virginia.   There, agents recovered thousands of oxycodone pills and other prescription medications, as well as dozens of pills bottles.   The pills and pill bottles were almost all, if not entirely all, sourced from prescriptions issued by DR. BALL.

110.    CALIX and SOVEREIGN possessed these oxycodone pills with the intent to distribute them.

(All in violation of Title 21, United States Code, Section 846; and
Title 21, Code of Federal Regulations, Section 1306.04(a))

## COUNTS TWO THROUGH TWENTY-ONE
### *(Distribution of Oxycodone)*

THE GRAND JURY FURTHER CHARGES THAT:

111.   The introductory paragraphs above and the paragraphs following Count One are re-alleged and re-incorporated as if fully set forth herein.

112.   On or about the dates shown in the table below, in the Eastern District of Virginia, the defendant, KIRSTEN VAN STEENBERG BALL, did knowingly and intentionally distribute a mixture and substance containing a detectable amount of oxycodone, a Schedule II controlled substance, by prescription to the following individuals, outside the scope of professional practice and not for a legitimate medical purpose.   Each prescription alleged constitutes a separate and distinct count.

| Count | Date | Patient |
|-------|------|---------|
| 2 | 5/27/2019 | CALIX |
| 3 | 11/8/2020 | CALIX |
| 4 | 8/20/2018 | SOVEREIGN |
| 5 | 10/11/2020 | SOVEREIGN |
| 6 | 3/25/2019 | H.H. |
| 7 | 4/23/2019 | H.H. |
| 8 | 11/4/2019 | C.T.-1 |
| 9 | 12/2/2019 | C.T.-1 |
| 10 | 1/23/2019 | M.W. |
| 11 | 12/24/2021 | M.Y |
| 12 | 1/25/2022 | M.Y |
| 13 | 9/15/2021 | C.T.-2 |
| 14 | 11/10/2021 | C.T.-2 |
| 15 | 7/13/2021 | UC-1 |
| 16 | 8/11/2021 | UC-1 |
| 17 | 9/8/2021 | UC-1 |

24

| 18 | 11/5/2021 | UC-1 |
|----|-----------|------|
| 19 | 12/3/2021 | UC-1 |
| 20 | 1/21/2022 | UC-1 |
| 21 | 3/15/2022 | UC-1 |

(In violation of Title 21, United States Code, Section 841(a)(1); and
Title 21, Code of Federal Regulations, Section 1306.04(a))

FORFEITURE NOTICE

THE GRAND JURY FURTHER FINDS PROBABLE CAUSE THAT:

1.     The defendant, KIRSTEN VAN STEENBERG BALL, if convicted of any of the violations alleged in this Indictment, shall forfeit to the United States, as part of the sentencing pursuant to Federal Rule of Criminal Procedure 32.2;

> a.   Any property constituting, or derived from, any proceeds obtained, directly or indirectly, as the result of the violation; and
>
> b.   Any property used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of, the violation.

2.     If any property that is subject to forfeiture above is not available, it is the intention of the United States to seek an order forfeiting substitute assets pursuant to Title 21, United States Code, Section 853(p) and Federal Rule of Criminal Procedure 32.2(e).

3.     The property subject to forfeiture includes, but is not limited to, the following:

> a.   5556 16th Street North, Arlington, Virginia 22205;
>
> b.   Commonwealth of Virginia medical license number 0101-239199;
>
> c.   All moneys in Morgan Stanley IRA 606-03781-238, up to $471,376.90.

(In accordance with Title 21, United States Code, Section 853)

A TRUE BILL:

Pursuant to the E-Government Act,,
The original of this page has been filed
under seal in the Clerk's Office
_____
Foreperson

Jessica D. Aber
United States Attorney

By:   _____
Katherine E. Rumbaugh
Assistant United States Attorney